Case number 21, 37, and 38, Bainbridge Fund versus Republic of Argentina. Mr. Costantini, whenever you're ready. Thank you for your support. I'm happy to be here, and it's very nice to be able to give a little talk like that. Let me, first of all, briefly go over how we got here, because this is more unusual appeal than most. We had two actions, although, involving the Senate of Argentina bond, and there was a similar case that was before the Second Century, and we decided together to stay the case, in our case, because there was an outcome. In that case, sort of proceed with the outcome once, and move on from there. That outcome was adverse to the position that we are taking here. It was done by some in the court, which is not binding on presidential, although I'm sure this court will look at a reasoning of that particular panel, and we decided that the arguments that were made, or the basis of the decision, was not something that we found misplaced. We thought that there were matters that had not been argued, achieved in all of these before that panel, and we ultimately agreed that the bond, there was an agreement through that challenge. A judgment was entered on that bond. When the president was seeking to enforce that bond, it was just a briefing on a terminal procedure. On the other six bonds, we agreed, and the official court actually entered a decision of order with the head of our judgment, that said basically, that she would decide the case against the president of those six bonds on the basis of the panel's opinion, that we wanted to come up and argue against that opinion, and reserve the right to do so. So there was no actual arguments in the district court. It was a foregone conclusion. There was no fact-finding in the district court. It was a foregone conclusion, and our understanding is that we are here basically to try to convince the three of you that the panel got it wrong. In terms of how we got it wrong, there's two statutes at issue here. One statute is the General Obligations Law 17-101, which is the New York statute having been used for a while. It basically is very simple. There has to be an acknowledgment, it has to be in writing, and it has to be signed according to the statute. We do not think there is any question that we have an acknowledgment. The vehicle which was in writing is what the Republican Bonds Tri-Muscle Reports, contrary to the name, they're issued four times a year, not two times a year, and they're available, they're published by the Ministry of Finance. They're available to anyone on the website of the Ministry of Finance. And you can look at these documents, or look at any of these Tri-Muscle Reports, and see that each bond, each bond that we have is listed. It's listed in terms of pay signing, in terms of pool of interest today. To us, that's an acknowledgment of the debt, and we don't really think there's a question about that. So any time, under that theory, a company lists a debt in a public filing, effectively, the statute of limitations would never run? They would say they listed a debt in a public filing, and they would be acknowledging that that's a debt. But it's just like listing a debt, the fact that they're continuing to... Right, quarterly, so it would, in effect, never run. I think it would be more significant than just listing a debt. But to answer your specific question, if I didn't want it to be acknowledged, I could very easily say in the public filing that this listing is not an acknowledgment and should not be taken as such. I could make a cautionary, inconsistent statement that would take it out of 17101. The Republic never did so. They will say they're an acknowledgment, talk about inconsistent statements, from forging on the signature, the filing was on the signature portion, which was not something that was decided in the Lease Bill, and twice, indeed, appealed. There are many courts in New York that have accepted something other than a signature. That's right. Counselor, my problem with the acknowledgment is different. Excuse me? My problem with the financial reports that you're talking about is different because you have to consider what the exchange rate, the various exchanges that occurred. And these were bonds that were not exchanged, right? They were kept out of the exchange, so there was no new issuance of bonds to these people. And those bonds, the whole point of the exchanges was that if you got into the exchanges, you could get new bonds that would be enforceable, but if you didn't, you just had your old bonds. And those bonds, there was no direct promise to pay those bonds. In fact, quite the opposite. The exchange documents indicated that they would be deferred or not paid. And those exchange documents were cited within the very statements that you're relying on for the acknowledgment. And if it's inconsistent with the payment obligation, then it can't be an acknowledgment. So that's where I'm hung up. Maybe you can help me with this. Well, you said something in your question. You said it's deferred and not paid. Right. Well, it's not an intention to pay. It's not an intention to pay. If you're going to defer it. Deferred is still an intention to pay. If they say we are not paying it, it is one payment. If they're saying that we will defer payment, maybe I should. Well, you're saying that simply saying I'm going to put off payment is still you can infer an intention to pay for that? Yes. But it's not an inconsistent statement, which is the requirement. There's one thing to say I'm not going to pay you. There's another thing to say I will pay you later. And it might be illustrated. But is there anything definite about when that will be paid, or is it just I'll pay you later at some point? Well, you can take examples. For example, in 2005, they made an exchange offer. Yes. And some people did not submit for exchange. At the end of that exchange offer, 75% of the people who have bonds have submitted. In 2010, they made another exchange offer. And the number went up to 90% or 91%, I think, to be exact. Then they made a settlement offer in 2016. So payments have continuously been made. Well, a settlement is not a statement of paying. I mean, the fact that there's a settlement is inconsistent with a duty or an agreement to pay the full amount. You're settling. And an acknowledgment has to be the acknowledgment of the debt. Well, it's still an acknowledgment of the debt that they're doing interest. And in 2016, some of the settlements were at full value for the judgments. I know that. Of course, I have clients who have judgments against them. You settle for that full value. So if you look at it over time, it's certainly not deferred, and it means it's not payment. I think the history shows that they will make payments when they get around to it. They are deferring. As I understand the precedents with respect to acknowledgment that triggers a restart of the period, the acknowledgment, the publication must be intended to affect the conduct of the creditor. And I don't see anything in the publication, in the quarterly Treasury reports, that's intended to affect the conduct of the bondholders. Well, I would agree with you in principle with the first statement, but I think there has to be a communication of some sort. I think, if someone reads the report, one of the points that we're making now briefly is the republic does not know who it owes money to or how much it owes. This is the only effective way to communicate with a bondholder. I'm not pointing to the aspect that it wasn't sent to the bondholders, which I understand would be a very difficult thing to do. It would be very difficult for Argentina to know who its bondholders were or how to send it to them. So I can see there's a decent argument that publication is a good way to communicate with – is a way to communicate with the bondholders. But I'm talking about the aspect mentioned in the precedents, that it must be intended to influence the conduct of the creditors. And I don't see anything in the publication in the Treasury quarterly reports that indicates any kind of intention to influence the conduct of the bondholders. I think I look at it differently than you do, Your Honor. If I am a bondholder and I'm reading this report, I've seen that they still acknowledge they owe me a debt, or they owe a debt to my bond, and they're proving interest thereof. I could see people relying on their debt to decide, I don't need to run for court soon. I might be – I might not get paid tomorrow like I'd like to be, and maybe a few years down the pipe, but they're still acknowledging a debt of interest. I, I think, am relying upon that to some extent in making my decision as to what to do – if I'm going to do anything about my student's bond, especially if it's a litigated bond. So I think there is – they don't have to say we have the intent to influence you. I think we have to look at the likely effect on bondholders reading the chart by the records. Well, the district court in Lukesko – am I pronouncing it correctly? Lukesko? Is that the name of the case? She said that the writings don't qualify the first – there were four different quarterly reports, I guess, and then there was a fifth one that dealt with the settlement. But the four that didn't deal with the settlement, she pointed out that none of these writings – the first four failed to meet the requirements because they pertain to debt swaps undertaken by Argentina and in which Argentina prohibited payment on debt not submitted to the swaps. And so quite clearly did not act with an intention to pay on non-submitted debt like Lukesko's in that case. What's wrong with that analysis? Well, I haven't gone back to the – to read the district court opinion in Lukesko. But in terms of what the – The purpose – the purpose of the – The purpose of the thing they say, they talk about the terms. In fact, they even classify it now as deferred payments. But the whole point was that they weren't going to pay on those debts. They were going to pay on the exchanged debt, the debt that the bondholders would receive in exchange. In this treatment, they cited to the decrees for the 2005-2010 exchange, and then in one of their footnotes in their briefs they explain those decrees and make it clear that it had to do with deferral of payments until some future time. And that was taken right from their translation of the statute, which translation I assume to be accurate. So if the district judge in Lukesko had a different impression, that occurred. I think the panel was certainly – certainly kind of different. They never said at any time, any place, certainly not in these triumphal reports, that we're never going to pay these – these debts. They have – they deferred the debt, and they have, in fact, paid the vast majority of that debt. And I think that's something I could look at as a bondholder at that time period. Thank you, counsel. You've reserved a couple minutes for rebuttal. We'll hear from Natalie. Good morning, Your Honors, and may it please the court. Carmine Maguzzi from Clerigot, on behalf of the public of Argentina. The plaintiff provides no basis for this court to move differently than the court did in Lukesko. Those decisions correctly affirm the dismissal of the Lukesko case as time bar all claims under the crude more than six years before the filing of the complaint. Since this court held in Augusto, the fact that the summary order is non-presidential, quote, does not mean that the court considers itself free to move differently in similar cases. As the court said in Soncho, such orders illustrate routine application of established law. In the established law of acknowledgement in New York State, the Lukesko panel, this court, cited the New York State Court of Appeals' Lou Morris decision and said to have an acknowledgement, you need recognition of an existing debt and have nothing inconsistent with an intention on the part of the debtor to pay it. And the court went on to say that the acknowledgement must, quote, be accompanied by circumstances amounting to an absolute and unqualified acknowledgement by the debtor of more being due, from which a promise may be inferred to pay the rest. That's Judge LaValle's point about activity or statements that lull a plaintiff into thinking they're going to get paid. And the Connecticut Trust case, and I want to cite that because it cited Lou Morris and it goes back even further just to be clear, that this court was doing no more than applying established law in 1902, made the same statement. And that was in the context of an individual debtor who wrote a letter saying, I can't pay now and I don't have much of a prospect in the near term. In other words, Mr. Costantini's deferred point, Mr. Costantini's argument is trying to make a difference when you defer a payment and saying I'm never going to pay ever. And the point is, you don't have to stamp every financial statement with a statement that says I'm never going to pay ever. Financial statements on their own do not establish acknowledgement, and that's clear from the case law. And the ones that we have here both have no statement of a promise to pay and include with them points that make it clear that it would be inconsistent to read these statements as containing a promise to pay. Number one, his bonds or the bonds that he holds are included in a separate section of the bonds not submitted to the exchange. And in that document, and it's in the appendix here, 8468, there's references to the two decrees he referenced, a decree from 2004, that's 1735, and a decree from 2010, 563. The 2004 decree explicitly says the republic is unable to service under the present contract terms. We can't pay this debt. That is inconsistent with a promise to pay or an acknowledgement. And the 2010 decree references that the payments are being deferred until completion of the restructuring process of the entire public debt originally incurred prior to December 31, 2001. His debt is part of the group of bonds that was indebtedness that was incurred by the Republic of Argentina before December 31, 2001. So the precondition for any payment would have to be restructuring of the bond, i.e., payment of some new obligation, not their obligation. So all of this on its face takes it out of its acknowledgement, but there's more. In the Bison B joint appendix, there are additional pages from the quarterly report that were included as part of that appeal. And there, the bonds not submitted to the exchange, i.e., his bonds, are completely separated from a category called normal payment status. In other words, these bonds are not getting paid. And also I would note the quarterly statement he's put in here, and of course none of this was presented to the district court, though of course the district court covered all this in Buchesco, is from March 2015. That date is significant because that was in the midst of the so-called Paricasu injunction period, when the district court, affirmed by this court, had enjoined Argentina from paying the exchange bond debt because Argentina had made very clear it would not and could not pay debt like Mr. Cosentini's clients. So to say that this document exists in circumstances as required by Luke Morris to evince an intent to pay the debt goes against the common sense facts before this court in the face of the document and what you need for the case law to satisfy the New York case law. And this was all covered by Buchesco. Buchesco keeps saying in the paragraph that covers the acknowledgment argument, did not have an intent to pay, did not have an intent to pay. So it's all very clear. And to your point, Judge Park, that's right. His rule would lead us to any financial statement that's out there on the internet would trigger, in his view, a reopening of a statute of limitations. And that goes exactly against the need for finality, certainty, and predictability that the New York State Court of Appeals has said again and again when it talks about statute of limitations issues. So for all those reasons, this court should follow Buchesco. And there's no reason to divert from it. And he can't argue that there's anything different about his client because that's in white, right? In the court below, footnote two, he says explicitly, I am covered by Buchesco, not by CD. My only interest is to ask the Court of Appeals to change its mind when it said Buchesco. That was admission. We said that's not to us. We retain all defenses to any such right to do that. And so we're here today. So we can't claim any difference from that first case. And Buchesco is clearly right. The other issue is the 211A issue in there. I think the panel's reading of the statute is very clear. You can't read person to include a foreign state. Is that going to negate all the other categories, the five categories that are covered by 211A? Sticking for a moment with the acknowledgment question, did the publications following the expiration of six years beyond the maturity date, did they continue to show further interest accruing? I believe they do show interest accruing, and that's the cycle of the World Bank standards for reporting on defaulted debt. You're required to still report that. But, again, it's separated into debt not being serviced within the report. And, again, he's got to separate the idea of there may be an obligation, but that isn't being acknowledged in the way required by the statute, and also that there may be a right or an obligation that exists. But that's separate from his remedy to sue on it, and then, of course, the statute of limitations that limits that remedy and in the report. In your brief, you cite a case law authority that says that in order to be an acknowledgement that triggers a renewal of the limitation period and reopening, it must be intended to influence the plaintiff's conduct in any manner, citing, for example, from the Flynn case at 175 Appellate Division 2nd, and I think you cite other authorities that say the same thing. But I don't read your brief to ever argue that this publication, there's nothing to show that this publication was intended to influence. Your brief doesn't seem to say that explicitly. Is that a point that you're arguing? Is that a point? They never allege that they were influenced at all. Well, I don't think they need to allege that. I think the issue is was Argentina's publication intended to influence? It was not. It was not. I'm saying is that a point you're arguing, that this publication, there's nothing to show that it was intended to influence? Correct. There's nothing to show that it was intended. And we go even further because we say since there's no – there are statements inconsistent in the report, which I went over, with an intention to pay, and there's no acting with an intent to pay, that it couldn't have influenced anybody to not sue. And we all know nobody was shy about suing the Republic of Argentina. No one was lulled into sitting on their hands and letting the statute of limitations run. And nothing in this report certainly made someone sit on the sidelines. And there's never been any showing of that. And we would certainly not agree with that. Is there no other questions? Thank you, Counsel. Mr. Costantini, you have three minutes. Okay. Thank you very much. Before I go on to a related question, most of my counsels say that there's a disagreement about what we're objective of. It's either – it's shown in a footnote that there is a disagreement. We don't have that here. With respect to the document – the tributary reports that were published afterwards, yes, they continue to prove interest. Not only do they continue to prove interest, but they add most majority interest, another column showing interest. And whether or not the World Bank required them to be treated that way, there still couldn't have been the inclusion of a statement that should have been if they wanted to really disavow and make this inconsistent statement. I'm doing what I may. As a person – as a sovereign person, we submit that they have what they have ignored. Person is a word that sometimes includes sovereign, sometimes not. There are cases that each of us decided. There are statutes that each of us decided. What I think we have to do is here we have to look at the legislative history, and that's something the panel did not do. The legislative history that makes up most of the special appendix on the original three makes two basic points that the New York legislature was urged to deal with. The first being – I want to go back a second. This used to be a 20-year section. It was changed pre-war to a six-year section. This is 10 years later, after the war, and many people who had New York bonds did not cash in because of the war, whether they were in service or maybe they were dead and they stayed at it. There were complications, and it's evident that there were complications. But there were also – it was mentioned that police advice is the freezing of securities and control of security by various national governments. So there is concern about other sovereign states, not just the state of New York. They're reading it the way the panel is, that you trust the state of New York, but then you read out the concern about the other sovereign. But even more than that, the legislature is very – and the constitutionality of the statute was because it was retroactive. In other words, there were five claims that had – The statute had run. Mm-hmm. The statute had run. Yes. And you could not do that, or at least the Law Review Commission said that you could not do that unless you did it in a statute of general application. And the biggest problem they had, other than New York bondholders, was bondholders of other sovereign states. You wanted an expansion. If that was the case, why didn't they write in other sovereign states rather than person? I mean, you're asking us to stretch person to cover this. And in doing that, it makes all of the other entities involved there, like domestic corporations, domestic states, surplusage. Well, that was the reasoning of the panel. Right. And what's wrong with that reasoning? In other words, that's a textualist argument. You're saying something that's fairly clear in the text, plain in the text, still needs to yield to the legislative history. It's sort of got it backwards, it seems. The surplus use argument is one that's inherently suspect because legislations are redundant all the time. I see. So we just – But the legislative history, I think, is more important. And they have – if they wanted – if the legislature wanted to shield the constitutionality of the statute, the easiest and best way to do it was to use person in an expansive manner to increase sovereigns because they wouldn't have all those sovereigns suing by constitutionality. They made other restrictions along the lines of full-fledged credit, et cetera, but they tried to narrow it down. But the original thrust was to expand the statute, not to narrow it and do your penalty suit. Questions? Thank you both. We'll take the case under advisement. The remaining cases on the calendar for today are on submission. So that concludes our business for the day. I'll ask the courtroom deputy to adjourn.